AMERICAN AIRWAYS, INC., and THE ÆTNA CASUALTY AND SURETY COMPANY, Plaintiffs, *v.* FORD MOTOR COMPANY, Defendant.

Supreme Court, Trial Term, New York County, February 2, 1939.

*Haight, Griffin, Deming & Gardner* [*Edgar R. Kraetzer, Donald Havens* and *David L. Corbin* of counsel], for the plaintiffs.

*Hurd, Hamlin & Hubbell* [*Edward E. Weadock* and *Emerson F. Davis* of counsel], for the defendant.

STEUER, J.   On August 9, 1931, at about seven o'clock in the morning, the airplane N-C 9662 rose from the airport at Cincinnati, Ohio.   It was owned by plaintiff American Airways, Inc., and used

by it as a passenger plane. In construction it was tri-motored, with Pratt & Whitney "Wasp" motors. On the occasion in question it carried four passengers and two pilots. Some yards from the airport the plane crossed Kellog road, where it was noticed by two competent observers. It was flying low and just after passing over the road an object, later identified as a propeller blade, was seen to fall. What happened later can be reconstructed from the evidence of the physical objects, which is in accordance with the observations of the eye-witnesses. The loss of the propeller caused severe vibration in the motor to which it was attached. It was a matter of but a few seconds before this vibration tore the motor from its supports and it fell from the plane. In falling the remaining blade cut the aileron cords by means of which the pilot controls the ship. The pilot, thereupon, unable to do anything further, reduced the risk of fire by shutting off the remaining motors. The plane turned over and fell sharply. All the occupants were instantly killed and the plane itself completely wrecked.

The type of propeller used consisted of two blades. These blades fit into a hub, which in turn fits onto the shaft of the engine. The hub consists of two halves, which, when fitted together, form a cylinder through which is a circular opening for the passage of the shaft. The hub of the right motor (the one which fell out) was found after the accident. It was broken across. It is undoubted that the break released the propeller blade and hence caused the accident. True it is that other defects in the plane were brought to light, but these could not have been the cause of the disaster.

The next question is, what caused the break in the hub. The blade that fell independently was found to have its tip sheared off. It was shown that if this occurred while the blade was revolving the extra stress engendered by the uneven revolutions would be more than sufficient to crack the hub. The evidence preponderated greatly against this being the sequence of events. The appearance of the broken blade was that of an instantaneous break, as the result of contact. No such thing took place on the flight. The blade can be ruled out as a factor in the cause of the failure of the hub. There was also testimony that any deviation from the forward line of flight, especially the acts of rising and landing, place greater stress on the blades, which is communicated to the hub. This is demonstrably true, but if such a stress, caused by normal operation, caused failure, the hub must have been of insufficient strength for the purpose for which it was used. There is no doubt that the hub broke through a fatigue break. That is a crack caused by repeated stresses, any one of which might be successfully resisted by the metal. It was shown that metal objects stand strains of

certain force indefinitely without discoverable effects. Greater forces produce results only after repeated applications. This is called fatigue. It takes the form of a crack in the object, which may be in the interior and not visible upon the surface. This crack grows, very slowly at first, but with increasing speed, and the final stages of growth, which ends in a separation of the metal object into two broken parts, is very rapid indeed.

When the hub in question (which bore the number 9053) was found after the accident on the edge of one of the circular openings for the shaft there was a minute ridge of raised metal. When fitted to the plane, a cone rests in this opening, and it is clear that this ridge corresponded to an opening inside of the cone. It was claimed that the assemblage involving the engine shaft, the cone and the hub, was so loose that the cone pounded against the hub, thus forcing this ridge of metal to rise. It is also claimed that the extra stress thus created broke the hub. This explanation is not credible. It is safe to assume that looseness of this character would be discoverable upon turning over the motors. It was not found. The explanation involves the finding that the ridge was created on this trip, because the ridge was not previously discovered, and, second, because the hub was so frequently removed that if it were a case of development over a period there would be many ridges, one for each place the cone rested in the hub. The last flight was less than two miles. It is unlikely that this would be enough time for such a development. The ridge can be explained by the sudden application of force upon the fall of the motor. There appears to be no scientific knowledge of amount of force required for a phenomenon of this sort, nor is there any way to find out the amount to which the surface in question was subjected. Consequently, there can be no exact determination.

This hub had upon one place on its inner surface machine marks which, while barely visible to the naked eye, were easily observable with an ordinary magnifying glass. It is well known that marks of this character greatly reduce an object's resistance to fatigue. The inference is inescapable that the hub failed because these marks reduced its fatigue resistance to a point where it was unable to meet the stress of ordinary operation.

Having concluded as to the cause of the failure, it remains to determine what responsibility the defendant had in connection with it. On February 24, 1931, defendant solicited plaintiff with a view to installing on its planes certain newly-developed high-speed equipment. This resulted in a contract, dated April 7, 1931, to install this equipment upon some six planes (including the N-C 9662) and to perform other services in connection with them. The important phrase in this contract reads: " Make complete

inspection of each airplane to determine all necessary and desirable maintenance work to be accomplished. List of recommended maintenance work to be furnished our representative for approval *before proceeding with any maintenance or other work on airplanes.*" On May 1, 1931, the N-C 9662 was delivered to defendant. On May twelfth it suggested 124 items of maintenance work. The hubs are not mentioned directly. The only item of significance here is " 123. Recondition propellers — Etch — Balance — Polish paint tips." " Etch " means to treat with certain solutions which, when applied, will reveal the existence of cracks. While the reconditioning, balancing and polishing applied strictly to the propeller blades, it was obviously the understanding of the parties that the hubs were to be etched, and this was done. No cracks were reported and none were discovered. It is claimed that the method used to search for cracks was not proper and had another method been used it would have revealed imperfections. Defendant's duty is to carry out what it represents, namely, that it will employ good accepted methods according to the development of the industry in its inspections. The method, it is urged, the defendant should have used may have been in use at one or two industrial plants, but the use was not so general nor its benefits so widely known that the failure to employ it amounted to a breach of duty.

The machine marks were discovered but not mentioned to. the plaintiff. One of defendant's former officers testified that at the time he would not have regarded them as of any significance. Yet at that time defendant's knowledge of the effect of machine marks was complete. On August 25, 1930, a memorandum directed to all persons concerned was distributed from defendant's aircraft engineering department. It called attention to the failure of a hub on a plane of the Stoat Air Services due to a crack which propagated from a sharp tool mark. The memorandum went on to say that all sharp tool marks on hubs that are in for servicing are to be noted and on new planes the part is to be returned to the manufacturer. In view of this memorandum, the only question that can be raised is whether the marks on the hub in question are of the character mentioned in the memorandum. The preponderance of proof is that they were. The defendant itself has laid down a rule of conduct that a proper inspection would call for these marks being noted and the plaintiff being so advised.

Plaintiff claims an additional dereliction of duty. This is that the defendant was aware at the time of the overhaul that hubs of this construction (designated as design number 1693) were of insufficient strength for this type of plane and motor. This claim of knowledge rests on certain correspondence between Hamilton Propeller Company, the manufacturer of the hub, and the defend-

ant. The latter company had designed a new hub, which it designated as C-5406, which had the same connecting design (called spindles) as hub 1693; but which was of heavier and stronger construction. The correspondence concerned substituting this new hub for the old. The main question argued was the terms of exchange. Mr. William Mayo, who conducted the negotiations on behalf of defendant, in his endeavors to make the Hamilton Propeller Company supply new hubs without charge, made statements about the old ones which would indicate that he knew for some time that hubs of type 1693 were not suitable. Taken at face value, these expressions would establish plaintiff's contentions. But the statements are not credible even as expressions of opinion. Correspondence between the Hamilton Propeller Company and the Department of Commerce and also with the plaintiff, together with the Department of Commerce regulations, indicates that professional opinion at the time was that design 1693 was adequate but that C-5406 might be preferable as being able to resist strain for a longer period. Mr. Mayo was seeking an undue advantage for his company, in the course of which he indulged in the exaggerations which on their face are damning. His position became all the more tenuous when the experience of this accident led the industry to a belief which to some extent corroborated his expressions.

This extensive review of the facts reveals these essential bases of decision. The plane fell because of a fatigue crack in a hub. This crack propagated from tool marks on the inner surface of the hub, which marks were discoverable upon a reasonable examination such as the defendant undertook to make. The defendant knew that such marks were a grave source of danger and neither reported that fact or the existence of the marks to the plaintiff. Defendant, therefore, failed in its duty. As between the parties, plaintiff had a right to rely on defendant's performance. (*Phœnix Bridge Co.* v. *Creem*, 102 App. Div. 354; affd., 185 N. Y. 580.) It can recover its losses on account of the dereliction regardless of the fact that in an action by a third person injured in the accident that same dereliction would not be a defense to it. (*Scott* v. *Curtis*, 195 N. Y. 424.) The damages include sums paid to such injured third persons by the insurance carrier, which is also a plaintiff. · (*Wanamaker, Inc.*, v. *Otis Elevator Co.*, 228 N. Y. 192.) Where, as here, such claims resulted in settlement rather than judgment, it must be established that the amounts paid were reasonable. (*Colonial Motor Coach Corp.* v. *New York Central R. R.*, 131 Misc. 891.) This was conceded on the trial. The amount paid was $60,722.90. The value of the plane at the time of the fall was $30,000. For these sums the respective plaintiffs are entitled to judgment.